## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **ADRIAN McPHERSON,** | ) | |
| | ) | **Case No. 3:07-cv-0002** |
| **McPherson,** | ) | |
| | ) | **Judge Haynes** |
| **vs.** | ) | **Magistrate Judge Griffin** |
| | ) | |
| **TENNESSEE FOOTBALL, INC.,** | ) | |
| **d/b/a TENNESSEE TITANS,** | ) | **JURY DEMAND** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

### I. <u>Introduction</u>

McPherson is a professional football player who played for the New Orleans Saints in the National Football League. He claims that he was injured by the Titans' mascot during a 2006 preseason football game in Nashville. As a result, McPherson avers, he was placed on "injured reserve" status by the Saints and missed the entire NFL season. He contends this sequence caused him to lose "earnings and earning capacity" and he seeks damages against the Titans for that loss.

His Complaint ignores multiple provisions in the National Football League's Collective Bargaining Agreement ("CBA") to which all NFL players and NFL teams are bound. In exchange for an expedited grievance and arbitration process, the National Football League Players Association ("NFLPA") and the National Football League Management Council ("NFLMC") – the sole and exclusive bargaining

1321682.1

Dockets.Justia.com

representatives of, respectively, NFL players and NFL teams – have agreed that NFL players will not sue NFL teams. Concomitant with its system of assured no-fault contractual compensation and workers' compensation benefits for NFL players injured in the performance of their professional duties, as well as related to team player salary cap rules and regulations that govern the economic relationship between players, the NFL and teams, the parties agreed that no NFL player would be owed or paid any amount of money other than that to which he was entitled under his player contract. Those provisions are integral to the terms and conditions of McPherson's employment in the NFL.

Yet, in filing his Complaint and seeking more money than he has already received under the CBA, McPherson ignores those CBA provisions altogether and he cannot ignore them. His lawsuit asks the Court to impose a set of rules completely different from those to which the parties have agreed and with which they have complied. Indeed, his invocation of traditional tort remedies in the judicial system expressly rejects the no fault injury compensation provisions and dispute resolution processes of the CBA for which McPherson's union collectively bargained. His lawsuit is preempted by Section 301 of the Labor Management Act and it must be dismissed as a matter of law.

The only remedy for McPherson's purported injuries is as set forth in the CBA, and that is through its grievance process. If that grievance was not resolved to McPherson's satisfaction, it escalates to final and binding arbitration. That is the dispute resolution process of the CBA to which all NFL players and all NFL clubs

are bound. Instead, he has chosen to sue under Tennessee common law. McPherson's resort to the judicial process requires the Court to interpret the CBA and determine, as a quick example, the following questions:

- Does McPherson's decision to file suit against the Titans violate the "no suit" provision of Article IV, Section 5?

- Does the Titans' purported "failure to properly supervise and train its employees and agents to perform [their] duties in a safe and reasonable manner" constitute non-compliance with the CBA in violation of Article IX, Section 1?

- Does McPherson's failure to file either a non-injury or injury grievance against the Titans pursuant to Article IX or Article X, respectively, bar his claim for damages for a football related injury against the Titans?

- Does the payment of any amount of money by an NFL club to an NFL player other than that to which the player is contractually entitled under his employment agreement (e.g., as "damages" in a tort lawsuit) violate Article XIV, Section 5(c)?

- Does a payment of damages to an NFL player for "loss of earnings and earning capacity" and "lost wages" violate paragraph 3 of the NFL Player Contract, which is incorporated into the CBA?

Section 301 of the LMRA precludes the result of McPherson's attempt to place the Court in that position and his remedies, if any, lie within the CBA and its governing dictates.

Regardless of how he describes his claim – whether as a tort or contract or something else altogether – McPherson's Complaint is preempted by Section 301 because its resolution substantially depends upon an interpretation of, and is inextricably intertwined with, the CBA. Perhaps the best evidence that it does so is that McPherson was compensated for his injury pursuant to the terms of the CBA.

An NFL player cannot pursue a negligence claim through the judicial system against an NFL team for injuries the player incurred in the performance of his NFL duties, regardless of whether those injuries were caused by running into an NFL teams' mascot, its players or a goal post on the football field. The CBA to which NFL players and NFL teams are bound creates a system of recovery for player injuries as well as for resolving disputes between them regarding injuries and compensation. Section 301 expressly has closed the door McPherson seeks to open. His Complaint must be dismissed.

## II. <u>Factual Background</u>

All NFL players are members of the NFLPA. Affidavit of Steve Underwood ("Underwood Affidavit") at ¶ 2 and Ex. 1 at 3. As the sole and exclusive bargaining representative of such players, and on their behalf, the NFLPA entered into a collective bargaining agreement with the NFLMC, the sole and exclusive bargaining representative of NFL teams, including both the Titans and the Saints. <u>Id.</u>

The CBA is the product of exhaustive, arms-length negotiations over several decades by the NFLMC and NFLPA and "represents the complete understanding of the parties on all subjects covered [t]herein." <u>Id.</u> The more than three hundred page CBA covers a broad range of subjects, including among others, NFL player contracts and salary provisions, draft rules, player injuries (including entitlements to medical benefits and workers compensation), regulations governing player termination and safety procedures. <u>Id.</u> at Ex. 1, <u>passim</u>. Like most collective bargaining agreements, the CBA also includes a dispute resolution process which

1321682.1

details the procedures to be followed in the event of a grievance regarding the compliance or non-compliance by a party with the terms and conditions of it. Id. at Ex. 1 at 22-32. In exchange for that collectively bargained for expedited dispute resolution process, the NFLPA and NFLMC agreed, among other promises, that no NFL player would file suit against any NFL club. Id. at Ex. 1 at 11.

McPherson was employed by the Saints as a professional football player during the 2005 NFL Season and a portion of the 2006 NFL Season. Docket Entry No. 1 at Ex. A at ¶ 5. As a player/employee of the Saints, McPherson participated in the August 12, 2006 preseason football game between the Saints and the Titans. Id. at ¶ 7. While McPherson was getting ready for the second half by catching punts by the Saints punter, he ran into a golf cart being driven by T-Rac, the Titans' mascot. Underwood Affidavit at ¶ 4. According to statements provided by McPherson to the press, he suffered only knee bruises as a result of his collision, see id. at ¶ 5 and Ex. 4, just as if he had run into a goal post or been tackled by an opposing player. As a result, McPherson was placed on the Saints' Injured Reserve list and continued to receive his full pay – more than Sixty Thousand Dollars – while he recuperated. Affidavit of Mickey Loomis ("Loomis Affidavit") at ¶ 5.

In October of 2006, the Saints determined that McPherson was no longer suffering from the injuries that he received in the Saints – Titans football game. Id. at ¶ 4. Thereafter, the Saints placed McPherson on waivers and his NFL Player Contract with the Saints was terminated on October 11, 2006. Id. McPherson did not file a grievance against either the Saints or the Titans regarding his purported

1321682.1

injuries during the Saints – Titans game or the separation of his employment.  Id. at ¶ 6; Underwood Affidavit at ¶ 8. Curiously McPherson refused the several requests by the Titans to be examined by a physician at the Titans' sole cost and expense and to provide a copy of his medical records from his doctors.  Underwood Affidavit at ¶ 4 and Ex. 3.

According to NFL records, after McPherson was released from employment by the Saints, he had professional football tryouts with the New York Giants on October 30, 2006 and with the Kansas City Chiefs on December 19, 2006.  Id. at ¶ 6. McPherson is currently under contract with the Austin Wranglers of the Arena Football League.  Id. at ¶ 7.

## III.  Legal Analysis

In his Complaint, McPherson avers a common law theory of negligence against the Titans arising from injuries he received in the course and scope of his employment during a professional football game between the Saints and the Titans. See Complaint at ¶¶ 5, 9, 14.  Despite his characterization of his claim as one sounding in tort, McPherson's claim is preempted by federal labor law and must be treated as a federal claim pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  To reach that conclusion, the Court must ask, and answer in the affirmative, the following questions:

1.  Is there a collective bargaining agreement, and if so, are both McPherson and the Titans parties to it and bound by it?

    *Yes.  The Preamble recognizes that the CBA is the collectively bargained for agreement between the sole and exclusive representatives of NFL players and NFL teams.*

1321682.1

2. Is there any provision of the collective bargaining agreement that prohibits McPherson from filing suit against the Titans?

*Yes. Article IV, Section 2 of the CBA provides that "[t]he NFLPA agrees that neither it … nor any members of its bargaining unit, will sue … the NFL or any Club with respect to any claim relating to any conduct permitted by this Agreement … or any term of this Agreement …." Articles IX and Articles X set forth the exclusive dispute resolution processes for non-injury and injury related claims by the parties.*

3. Is the claim upon which McPherson seeks relief in his Complaint dependent upon an analysis of the terms and conditions of, or does it otherwise touch upon, the collective bargaining agreement?

*Yes. Multiple provisions of the CBA are implicated and must be interpreted. For example, Articles IX and X create the dispute resolution process for injured players and the remedies therefore. Article XIII creates a "Joint Committee on Player Safety and Welfare" for purposes of addressing safety issues and any other "subject related to player safety and welfare." Article XIV sets forth the rules governing player contracts, including provisions relating to the rights of players to receive certain injury benefits, such as the continued receipt of salary. That Article also prohibits an NFL Club from paying an NFL player any money other than that to which the player is contractually entitled.*

Having collectively bargained for a particular remedy and resolution process, McPherson cannot now seek an altogether different remedy and resolution process through the courts. His Complaint must be dismissed as a matter of law.

## A. PLAINTIFF AND THE TITANS ARE BOUND BY THE TERMS AND CONDITIONS OF THE NATIONAL FOOTBALL LEAGUE COLLECTIVE BARGAINING AGREEMENT.

It is without dispute that all NFL players and all NFL teams are bound by the CBA. The Preamble to it provides in relevant part as follows:

This Agreement, which is the product of bona fide, arm's length collective bargaining, is made and entered into on the 6th day of May,

1321682.1

7

1993, in accordance with the provisions of the National Labor Relations Act, as amended, by and between the National Football League Management Council ("Management Council" or "NFLMC"), which is recognized as the sole and exclusive bargaining representative of present and future employer member Clubs of the National Football League ("NFL" or "League"), and the National Football League Players Association ("NFLPA"), which is recognized as the sole and exclusive bargaining representative of present and future employee players in the NFL ....

Underwood Affidavit at Ex. 1 at 3. Having collectively bargained for its promises and commitments, there is no doubt that McPherson and the Titans are bound by the terms and conditions of the CBA. See Cincinnati Bengals, Inc. v. Thompson, 553 F. Supp. 1011, 1014 (S.D. Ohio 1983).

**B.    THE PARTIES TO THE COLLECTIVE BARGAINING AGREEMENT AGREED THAT NFL PLAYERS WOULD NOT SUE NFL TEAMS.**

In exchange for an expedited system of dispute resolution, the parties to the CBA agreed to forgo filing suit "with respect to any claim relating to any conduct permitted by ... or any term of" the CBA. Underwood Affidavit at Ex. 1 at 11. Article IX and X set forth the grievance provisions and final and binding arbitration processes to be utilized by NFL players and NFL teams to resolve non-injury and injury disputes. The CBA includes a "reservation of rights" clause, which preserves a player's ability to bring certain, specifically identified legal claims against the NFL teams, such as anti-trust claims. See id. at Ex. 1 at 223. Conspicuously absent from the CBA is any carve-out permitting players to bring tort law claim in any forum other than arbitration (as set forth in Article IX) for injuries incurred by them in the course of their professional duties. This, coupled with the express

prohibition against NFL players filing lawsuits against NFL teams for matters related to the CBA likely explains why, to the Titans' knowledge, every claim asserted by an NFL player against an NFL team arising out of an on-field injury since the current CBA became effective in May of 1993 – more than four hundred claims in total – has been filed pursuant to the CBA's arbitration provision.  Id. at ¶ 9.  McPherson's claim is no different.

### C. THE CLAIM UPON WHICH MCPHERSON'S COMPLAINT IS BASED IS SUBSTANTIALLY DEPENDENT UPON, AND REQUIRES THE COURT TO INTERPRET, THE COLLECTIVE BARGAINING AGREEMENT.

#### 1. Removal of McPherson's Complaint is Proper.[1]

Complaints originally filed in state court may be removed to federal court only if the case could have been filed, in the first instance, in federal court.  See 28 U.S.C. § 1441(a).  Federal jurisdiction typically exists where a federal question is presented on the face of a plaintiff's complaint.  Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987).  As the Court well knows, the "complete preemption" doctrine is an exception to the "well pleaded complaint rule."  Beneficial Nat. Bank v. Anderson, 539 U.S. 1, 8 (2003).  The theory behind the doctrine is that "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-

---

[1] McPherson has filed a Motion to Remand (Docket Entry No. 7), to which the Titans responded in opposition (Docket Entry No. 8) contemporaneously with the filing of its Motion to Dismiss and Supporting Memorandum of Law.   Resolution of the Motion to Remand goes hand in glove with the resolution of the Motion to Dismiss.

pleaded complaint rule.'" <u>Caterpillar</u>, 482 U.S. at 393 (quoting <u>Metro. Life Ins. Co.</u> <u>v. Taylor</u>, 481 U.S. 58, 65 (1987)).

The Sixth Circuit Court of Appeals recognizes that Section 301 of the LMRA[2] has an unusually powerful preemptive force over a claim for relief sought exclusively under state law. See <u>Alongi v. Ford Motor Co.</u>, 386 F.3d 716, 723-24 (6th Cir. 2004). It is well established that Section 301 completely preempts state law claims, including tort law claims, that involve the interpretation of a collective bargaining agreement. <u>United Steelworkers of Am. v. Rawson</u>, 495 U.S. 362, 368-69 (1990). This must be so, for "if the policies that animate § 301 are to be given their proper range, … the preemptive effect of § 301 must extend beyond suits alleging contract violations. These policies require that 'the relationships created by [a collective-bargaining] agreement' be defined by application of 'an evolving federal common law grounded in national labor policy.'" <u>Allis-Chalmers Corp. v.</u> <u>Lueck</u>, 471 U.S. 202, 210-11 (1985) (brackets in internal quote in original) (quoting <u>Bowen v. United States Postal Serv.</u>, 459 U.S. 212, 225 (1983)).

Section 301 preemption jurisprudence is familiar. "When resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be

---

[2] Section 301 provides in relevant part as follows:

> (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

28 U.S.C. § 185(a).

1321682.1

treated as a § 301 claim, or dismissed as preempted by federal labor-contract law." <u>Allis-Chalmers</u>, 471 U.S. at 220. In <u>Lingle v. Norge Div. of Magic Chef, Inc.</u>, the United States Supreme Court noted that "[i]f the resolution of a state-law claim depends upon the meaning of a collective bargaining agreement, the application of state law … is preempted and federal labor-law principles – necessarily uniform throughout the Nation – must be employed to resolve the dispute." 486 U.S. 399, 406-07 (1988). A state-law claim survives § 301 preemption only when it is amenable to resolution without interpreting the collective bargaining agreement. <u>Id.</u> at 409-10. McPherson's is not.

"Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim and therefore arises under federal law." <u>Caterpillar</u>, 482 U.S. at 393. Thus, state law claims preempted by Section 301 are properly removable to federal court, despite a plaintiff's failure to explicitly plead a federal cause of action. <u>See</u> <u>Lingle</u>, 486 U.S. at 406 n.5.

In this Circuit, the Supreme Court's Section 301 preemption precedent of <u>Allis-Chalmers</u> and <u>Lingle</u> has evolved into a two part test:

> First, courts must determine whether resolving the state-law claims would require interpretation of the terms of the collective bargaining agreement. If so, the claim is preempted. Second, courts must ascertain whether the rights claimed by the plaintiff were created by the collective bargaining agreement, or instead by state law. … If the rights were created by the collective bargaining agreement, the claim is preempted. In short, if a state-law claim fails <u>either</u> of these two requirements, it is preempted by § 301.

<u>Mattis v. Massman</u>, 355 F.3d 902, 906 (6th Cir. 2004) (emphasis in original). McPherson's tort claim fails both.

## 2. McPherson's State Law Tort Claim is Preempted Completely by Section 301.

McPherson's negligence claim is preempted by Section 301 of the LMRA because it cannot be resolved without interpreting and applying the CBA. Indeed, federal courts that have considered the precise issue raised by McPherson – whether an NFL player can recover in tort from an NFL team for injuries incurred in the course and scope of his professional duties in the NFL – uniformly have ruled that such disputes require the interpretation and application of the CBA and thus must be resolved pursuant to the grievance process and arbitration provisions to which the parties to the CBA agreed. <u>See, e.g.</u>, <u>Smith v. Houston Oilers, Inc.</u>, 87 F.3d 717, 720-721 (5th Cir. 1996) (dismissing state law claims of coercion, duress, extortion, intentional infliction of emotional distress arising out of NFL players' purported injuries from their participation in rehabilitation program by NFL team because claims were preempted by Section 301); <u>Sherwin v. Indianapolis Colts, Inc.</u>, 752 F. Supp. 1172, 1178 (N.D.N.Y. 1990) (dismissing state law claims for negligence, medical malpractice, fraud, negligent misrepresentation and negligent infliction of emotional distress arising out of NFL player's purported injuries and treatment thereof by NFL team doctors because claims were preempted by Section 301); <u>Rudnay v. Kansas City Chiefs Football Club</u>, 1983 U.S. Dist. LEXIS 12595, *6-7 (W.D. Mo. Oct. 19, 1983) (dismissing state law claim for breach of contract and tortuous interference with contract arising out of NFL player's purported injuries

1321682.1

against NFL team because claims were preempted by Section 301). McPherson's claim – and legal result thereof – is no different here.

Federal courts must apply Section 301 preemption broadly to "ensure uniform interpretation of collective bargaining agreements." Lingle, 486 U.S at 404. In Allis-Chalmers, the Supreme Court explained that Section 301 is not merely a jurisdictional provision, but is a "congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." 471 U.S. at 209. Thus, any state law tort claim by an employee that is "inextricably intertwined with consideration of the terms of [a] labor contract" – including matters that may be fairly "implied" from the labor agreement – is completely preempted by Section 301. Id. at 213, 215. If federal law did not preempt all such claims, whether expressly or impliedly arising out of the parties' labor agreement, then plaintiffs could easily evade the preemptive force of Section 301 simply by relabeling their claims as sounding in tort and thus avoid their agreement to have an arbitrator interpret the parties' obligations. Id. at 211, 219.

Viewed against the applicable standards, McPherson's state law tort claim is preempted clearly by Section 301.

Resolution of McPherson's tort claim requires interpretation of the terms of the collective bargaining agreement. Multiple provisions of the CBA are relevant. For example, Article XIII creates a Joint Committee on Player Safety and Welfare for purposes of addressing safety issues and any other "subject related to player safety and welfare." Likewise, Article XIV sets forth the rules governing player

contracts, including provisions relating to the rights of players to receive certain injury benefits, such as the continued receipt of salary.

In addition to the aforementioned provisions of the CBA, and perhaps even more important for the reasons set forth in Section III.B., supra, the parties agreed in Articles IX and X of the CBA that NFL players would resolve their disputes against NFL teams through the grievance process and arbitration procedures. How can a Court decide whether an NFL player is required to grieve his dispute without resorting to the language of the CBA? In answering that question, the Court must interpret, among other provisions of the CBA, Article XIV, Section 5(c), which prohibits an NFL team from paying an NFL player any money to which that player is not contractually entitled. Thus, for example, if the Court permitted McPherson to proceed in tort and ultimately to recover damages, the Titans would be placed in the untenable position of being subject to a judgment of the Court, the satisfaction of which might violate the CBA and potentially subject the Titans to discipline from the NFL.

It is without peradventure that the right of NFL players to recover lost income due to football related injuries from NFL teams is created and defined exclusively by the CBA. Paragraph 9 of the standardized NFL Player Contract[3]

---

[3]   The standardized NFL Player Contract is actually part of the CBA and is attached to the CBA as Appendix C. Article XIV, Section 1 of the CBA provides that the NFL Player Contract form attached as Appendix C to the CBA must be used for all player signings. Because the CBA incorporates the standardized NFL Player Contract, the agreements are considered together for purposes of preemption analysis. Sherwin, 752 F. Supp. at 1177-78.

1321682.1

provides in relevant part:

> 9. INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract.

Thus, under the CBA, the parties agreed that if a player is injured practicing or playing football, he shall continue to be paid his full salary during the season in which was injured until he recovers from his injury, notwithstanding the fact that he is unable to play football. The CBA does not distinguish between a player who is injured by another player, by running into a goal post, by being hit by an object thrown from the stands or by colliding with a mascot, all of which occur "in the performance of [the player's] services" under the contract. Here, in accordance with the above provisions of the standardized NFL Player Contract, the Saints paid and McPherson accepted a total of $62,553.10 – every dollar to which he was entitled under the CBA – while he was recovering from the injuries he received in the Saints - Titans game. Loomis Affidavit at ¶ 5.

Additionally, Article 17, Section 17.6 (C) of the NFL Constitution and Bylaws[4] requires that players placed on Injured Reserve continued to be compensated at their full salary. Again, in accordance with the provisions of the

---

[4] Article III, Section 1 of the CBA incorporates the NFL Constitution and Bylaws by reference and provides in relevant part, "the NFLPA and the Management Council waive all rights to bargain with one another concerning any subject covered or not covered in this Agreement, including the provisions of the NFL Constitution and Bylaws; . . . ."

1321682.1

NFL Constitution and Bylaws, the Saints paid McPherson the full salary due him under his NFL Player Contract while he was on Injured Reserve. Loomis Affidavit at ¶ 5.

Further, Article X, Section 1 of the CBA provides that a player's contract may not be terminated while he is injured if such injury was incurred in the performance of work related duties, such as practicing or playing football. In accordance with such provisions, the Saints allowed McPherson to fully recover from his injuries before his contract was terminated. Id. at ¶ 4.

McPherson's claim against the Titans also requires the Court to parse the language of the CBA to determine what duty an NFL team owes to an NFL player on an opposing team because there is no free-standing duty owed by an NFL team to a player on an opposing club during a football game. To find otherwise would create an avalanche of litigation by NFL players (and for that matter, by any professional athlete) against opposing NFL teams for injuries incurred in the course and scope of their professional duties. That is an absurd result and the Titans' research has not revealed any case in which a court has recognized such a cause of action. Indeed, in Hackbart v. Cincinnati Bengals, Inc., 601 F.2d 516 (10th Cir. 1979), the Tenth Circuit Court of Appeals recognized that "subjecting another to unreasonable risk of harm, the essence of negligence, is inherent in the game of football, for admittedly it is violent." Id. at 520; see also Gauvin v. Clark, 537 N.E.2d 94, 96 (Mass. 1989) (noting that the "courts are wary of imposing wide tort liability on sports participants, lest the law chill the vigor of athletic competition.").

At its core, McPherson's Complaint seeks to recover damages which his exclusive bargaining agent, the NFLPA, negotiated would be limited to his salary, which he received. If McPherson believes that he is entitled to any other damages from the Titans or the Saints or any other NFL team, he must pursue them pursuant to the grievance and arbitration dispute resolution process set forth in the CBA.

McPherson's claim fails both questions of the Sixth Circuit's preemption test. See Mattis, 355 F.3d at 906. His Complaint must be dismissed as a matter of law.

### D. PLAINTIFF IS PRECLUDED FROM PURSUING HIS DAMAGES CLAIM AGAINST THE TITANS THROUGH JUDICIAL PROCEEDINGS.

Because McPherson's claim is preempted by Section 301 of the LMRA, he must pursue his claim through the grievance procedures and arbitration provisions provided in the CBA. As the parties have agreed in the CBA, dispute resolution is to culminate in binding arbitration; thus, McPherson may not pursue his claim against the Titans (or any other NFL team) through judicial proceedings.

It is a well settled principle of federal law that courts defer to the grievance and arbitration procedures contained in collective bargaining agreements. Federal law is predicated upon the theory that the parties' contractual procedures for the settlement of labor-management disputes are preferable to judicial resolution of such disputes. Accordingly, under federal law, courts must enforce arbitration provisions contained in collective bargaining agreements. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 451, 456 (1957).

When a collective bargaining agreement contains a grievance and arbitration procedure, a party to the agreement must attempt to resolve its labor dispute through the use of those procedures before seeking a judicial remedy. <u>Republic Steel Corp. v. Maddox</u>, 379 U.S. 650, 652 (1965). If the collective bargaining agreement contains dispute resolution procedures that are to be final and binding on the parties, then a judicial resolution of the dispute is precluded. <u>Humphrey v. Moore</u>, 375 U.S. 335, 351 (1964).

In applying an arbitration clause in a collective bargaining agreement, a court's function is terminated once it decides that the issue is a proper subject for arbitration. As the Supreme Court held in <u>United Steelworkers v. American Mfg.</u>:

> The function of the Court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. . . . The Courts, therefore, have no business weighing the merits of the grievance.

363 U.S. 564, 567-68 (1960).

The CBA at issue is the product of exhaustive, arms-length negotiations over several decades by the NFLMC and NFLPA and "represents the complete understanding of the parties on all subjects covered [t]herein." Underwood Affidavit at ¶ 2 at Ex. 1 at 10. The more than three hundred page CBA covers a broad range of subjects, including among others, NFL player contracts and salary provisions, draft rules, player injuries (including entitlements to medical benefits and workers compensation), regulations governing player termination and safety

procedures.  Id. at Ex. 1, passim.  Like most collective bargaining agreements, the CBA also includes a dispute resolution process which details the procedures to be followed in the event of a grievance regarding the compliance or non-compliance by a party with the terms and conditions of it.  Id. at Ex. 1 at 22-32.   In exchange for that collectively bargained for expedited dispute resolution process, the NFLPA and NFLMC agreed that no NFL player would file suit against any NFL club.  Id. at Ex. 1 at 11-12.

Article IX, Section 1 of the CBA provides that any dispute involving the interpretation of, application of, or compliance with any provision of the CBA, an NFL player contract, or any applicable provision of the NFL constitution and bylaws pertaining to the terms and conditions of employment of NFL players will be resolved exclusively in accordance with the grievance and arbitration provisions contained in Article IX of the CBA.   Id.[5]   Article IX of the CBA provides for a detailed grievance procedure which culminates in binding arbitration.  Id.[6]

The purpose of that dispute resolution process is obvious: work requirements that have no application in a typical employment environment are the custom and norm in the world of professional football.  With grievances and arbitration, NFL

---

[5] Article IX, Section 1 of the CBA provides in relevant part as follows:
Section 1. Definition:  Any dispute (hereinafter referred to as a "grievance") arising after the execution of this Agreement and involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, or any applicable provision of the NFL Constitution and bylaws pertaining to terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article, except wherever another method of dispute resolution is set forth elsewhere I this Agreement.

[6] Article IX, Section 8 of the CBA provides in relevant part as follows:
The decision of the arbitrator will constitute full, final and complete disposition of the grievance, and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement.

1321682.1

teams and NFL players resolve their disputes with individuals who possess special knowledge of the custom and practices of professional football.

McPherson's union collectively bargained for a particular remedy in a particular forum for injuries incurred by its members, including McPherson, in the course and scope of their professional football duties. The Court should enforce the obligations to which NFLPA and the NFLMC agreed. The Complaint must be dismissed as a matter of law.

## IV. <u>Conclusion</u>

For the foregoing reasons, McPherson's common law tort claim is completely preempted by Section 301 of the LMRA and his Complaint must be dismissed as a matter of law.

s/Mark W. Peters
Robert E. Boston, Tenn. BPR # 9744
Mark W. Peters, Tenn. BPR # 18422
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville City Center
Nashville, TN 37219
(615) 244-6380 (telephone)
(615) 244-6804 (facsimile)
bob.boston@wallerlaw.com
mark.peters@wallerlaw.com

Attorneys for Defendant

1321682.1

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served electronically, by operation of the Court's electronic filing system, upon James R. Krenis, Hill-Boren PC, 191 Jefferson Avenue, Memphis, Tennessee 38103, on this the 31st day of January, 2007.

s/Mark W. Peters
Robert E. Boston, Tenn. BPR # 9744
Mark W. Peters, Tenn. BPR # 18422
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville City Center
Nashville, TN 37219
(615) 244-6380 (telephone)
(615) 244-6804 (facsimile)
bob.boston@wallerlaw.com
mark.peters@wallerlaw.com

Attorneys for Defendant

1321682.1